UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHERRI M., §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>COMMISSIONER OF SOCIAL SECURITY, §<br>§<br>Defendant. § | Case # 1:19-cv-1319-DB<br><br>MEMORANDUM DECISION<br>AND ORDER |

## INTRODUCTION

Plaintiff Sherri M. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the Act). *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 18).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 16. Plaintiff also filed a reply. *See* ECF No. 17. For the reasons set forth below, Plaintiff's motion (ECF No. 9) is **DENIED,** and the Commissioner's motion (ECF No. 16) is **GRANTED.**

## BACKGROUND

Plaintiff protectively filed her DIB application on February 6, 2015, alleging disability beginning March 31, 2013 (the disability onset date) due to depression, anxiety, migraines, hip, back and knee injuries. Transcript ("Tr.") 177-78, 205. Plaintiff's application was denied initially on May 20, 2015, after which she requested an administrative hearing. Tr. 10, 83. On August 18, 2017, Administrative Law Judge Lisa B. Martin (the "ALJ") conducted a video hearing from Falls Church, Virginia. Tr. 10, 44-82. Plaintiff appeared and testified from Buffalo, New York, and was

represented by Jeanne Murray, an attorney. Tr. 10. Suman Srinivasan, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*.

On December 27, 2017, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled.[1] Tr. 10-27. On August 3, 2019, the Appeals Council denied Plaintiff's request for review. Tr. 1-4. The ALJ's December 27, 2017 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

---

[1] Plaintiff previously filed a DIB application on July 3, 2013, which was denied initially on September 17, 2013. Tr. 10. As the ALJ explained, the March 31, 2013 onset date alleged in the current claim invades the period adjudicated in the previous claim; however, the ALJ found no basis for reopening the prior application.

work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her December 27, 2017 decision:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2016;

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 31, 2013 through her date last insured of September 30, 2016 (20 CFR 404.1571 et seq.);

3. Through the date last insured, the claimant had the following severe impairments: migraine headaches, history of remote left hip fracture with residual limitations, left knee disorder, cervical and lumbar spine disorders, obesity, depression, and anxiety (20 CFR 404.1520(c));

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5. Through the date last insured, the claimant had the residual functional capacity to perform a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b),[2] except as follows. The claimant needs a position change opportunity as often as every 45 minutes for one to two minutes while remaining on task. She must avoid all climbing of ladders, ropes, or scaffolds, and could occasionally perform all other postural motions. The claimant is limited to occasional pushing/pulling with the lower extremities. She is limited to frequent, but not constant, upper extremity reaching, handling, and fingering tasks. The claimant is precluded from all exposure to dangerous work hazards (including unprotected heights and exposed moving machinery), all extreme heat, humidity, and cold conditions, and all concentrated pulmonary irritants. She can perform detailed, but not complex work, and not perform any fast assembly quota pace. She is precluded from bright light work environments (beyond typical office lighting), is limited to moderate noise work environments, and must not experience sustained food smells (e.g. restaurant environment work) because of headache exacerbations. The claimant would be off task up to five percent of the workday due to symptom exacerbations. Finally, she is limited to having only occasional required work interactions with coworkers, supervisors, and the public;

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

6. Through the date last insured, the claimant was capable of performing past relevant work as a file clerk II. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565);

7. The claimant was born on November 27, 1962 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563);

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers in the national economy that the claimant also could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from March 31, 2013, the alleged onset date, through September 30, 2016, the date last insured (20 CFR 404.1520(1)).

Tr. 10-27.

Accordingly, the ALJ determined that, for a period of disability and disability insurance benefits filed on February 6, 2015, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 27.

## ANALYSIS

Plaintiff asserts two points of error. Plaintiff first argues that the ALJ's RFC finding is erroneously based on her own lay opinion because, although it gave great weight to the opinion of consultative psychologist Kevin Duffy, Psy.D. ("Dr. Duffy"), the decision did not incorporate all of the limitations assessed by Dr. Duffy. *See* ECF No. 9-1 at 1, 15-19. Plaintiff next argues that the ALJ should have ordered cognitive testing before assigning great weight to Dr. Duffy's opinion, because Dr. Duffy stated that without such testing, it was difficult to determine if Plaintiff had the ability to function on a daily basis. *Id.* at 20 (citing Tr. 288-89).

5

The Commissioner argues in response that the ALJ's RFC finding is supported by substantial evidence in the record, including medical opinions from Dr. Duffy and state agency psychologist Dr. M. Marks, as well as other treatment records. *See* ECF No. 16-1 at 7-14. Further, argues the Commissioner, the record simply does not support that Plaintiff had cognitive impairments. *See id*. at 14-16.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Plaintiff alleges she is disabled by a combination of physical and mental conditions, including migraines, hip pain, depression, anxiety, and hip, back, and knee pain. Tr. 205. Plaintiff alleges her conditions stem from a motorcycle accident at the age of 16, which left her severely injured and "hospitalized for a long period of time." Tr. 285, 291. After the accident, she was in a coma for some period of time and received speech therapy, occupational therapy, and physical therapy due to her brain injury. Tr. 285-86. Plaintiff alleges that her symptoms have worsened over time, particularly her migraine headaches. Tr. 58, 285.

On May 11, 2012, Plaintiff was hospitalized at Erie County Medical Center following a suicide attempt. Tr. 440. Medical records indicate that she was transferred from Lakeshore following an "intentional overdose on prescribed antidepressant." Tr. 440. Plaintiff reported she had experienced a moment of "high stress and crying" due to marital strife. Tr. 440. She reported

feeling worse after leaving her full-time job and, as a result, having more time to "think about everything that happened and feel horrible about it." *Id*.

On April 10, 2012, Plaintiff presented to Nicolas Selkall, M.D. ("Dr. Selkall"), at DENT Neurologic Institute ("DENT") for neurologic evaluation. Tr. 321. Plaintiff reported that she continued to have over 15 migraine days a month lasting at least 4 hours each. Tr. 321. Upon examination, Dr. Selkall noted "trigger points felt in the trapezius muscles bilaterally which are tender to light touch." Tr. 322. He diagnosed "chronic migraine w/o aura, w/intractable migraine, w/status migrainosus;" "migraine without aura;" "myofascial pain;" "cervicalgia;" and sleep disturbance. *Id*. Further, Dr. Selkall advised that Botox treatment would be the best option for treatment of her migraines and noted that Plaintiff would need to start tapering off her use of Topamax due to the "risks of neural tube defects associated" with the medication. *Id*.

On October 29, 2013, Plaintiff presented for medical treatment with a chief complaint of a migraine headache which had been present for the past five days. Tr. 328. She was diagnosed with a of "migraine classical w/intractable w/o status migrainosus" and was given an injection of Tordol 60 mg, as well as a refill for Reglan, as treatment for the associated nausea. Tr. 331.

Approximately eight months later, on June 17, 2014, Plaintiff presented for medical treatment with a chief complaint of a migraine that had been present for the past three days. Tr. 335. The treatment notes provide that Plaintiff "had been taking Topamax and using the Imitrex, but nothing seem[ed] to be helping." *Id*. She also reported photophobia, blurred vision, and nausea." *Id*. She was diagnosed with "migraine classical w/intractable w/o status migrainosus" and given an injection of Tordol 60 mg. Tr. 337. Additionally, she was advised to continue taking her Topamax and to use no more than two doses of Imitrex in a 24-hour period. *Id*.

On October 29, 2014, Plaintiff presented to Eugene J. Gosy, M.D. ("Dr. Gosy"), at Gosy & Associates Pain Treatment & Neurology, LLP ("Gosy"), for evaluation of recurrent headaches. Tr. 273. Plaintiff reported that her symptoms began at age 16 when she was involved in a severe motorcycle accident. *Id*. She reported that the pain starts in the sub occipital territory or base of neck and evolves into "severe bitemporal throbbing" and that her headaches were triggered primarily by aromas or bright lights and can last up to two weeks. *Id*. Plaintiff also reported that she was experiencing depressed mood, poor sleep, and had gained 150 pounds over the past two years. Tr. 273-74. Dr. Gosy assessed Plaintiff with migraine headache disorder without aura, mood disorder, and headache, and increased plaintiff's Topamax dosage. Tr. 275. She was advised to continue taking Imitrex and Sumavel orally for headaches. *Id*. Additionally, Dr. Gosy noted that he would order Botox injections and prescribed Effexor for her depression. *Id*.

The record reflects that Plaintiff continued ongoing care and treatment with Dr. Gosy for her migraine headaches from January 2015 to May 2016, receiving several Botox injections. *See, e.g.*, Tr. 276, 380. On June 3, 2015, Plaintiff reported that despite benefitting from the Botox injections she "does experience breakthrough headaches between Botox injections." Tr. 382. The treatment notes also state that Plaintiff was "intermittently weepy" during the visit and expressed feelings of depression and loss of motivation which sometimes caused her to spend the entire day in bed. Tr. 382. Plaintiff was diagnosed with unspecified depressive order and headache. Tr. 384. She was prescribed Cymbalta for depression and advised to continue taking Wellbutrin and to arrange for psychiatric consultation. *Id*. She was also advised to continue taking Topamax for headache prevention. *Id*.

On April 9, 2015, Plaintiff underwent a psychiatric evaluation by Dr. Duffy. Tr. 285-89. She reported a history of psychiatric hospitalization in 2012 for a suicide attempt. Tr. 285. Plaintiff

stated that although she had seen a psychologist in the past, she was not currently receiving any mental health treatment. *Id*. She reported her current mental health symptoms included a loss of usual interests, irritability, fatigue, diminished self-esteem, concentration difficulties, social withdrawal and irritability. Tr. 286. Plaintiff stated that she was "let go" from her last position of employment because she "became very emotional at times, was combative," and was having interpersonal problems with co-workers and supervisors. Tr. 285.

Dr. Duffy noted that Plaintiff was cooperative during the consultative examination but assessed her affect as "somewhat depressed" and her expressive and receptive language as "just adequate." Tr. 287. He described Plaintiff's cognitive functioning as "somewhat below average at this time." Tr. 288. Dr. Duffy assessed Plaintiff with "mild to moderate difficulties maintaining attention and concentration." Tr. 288. He opined that Plaintiff had "mild to moderate difficulties learning new tasks," as well as "mild to moderate difficulties performing complex tasks independently" and "moderate difficulties dealing appropriately with stress." *Id*. Dr. Duffy further opined that Plaintiff's "current difficulties are caused by psychiatric problems and some suspected cognitive deficits that are secondary to the motor vehicle accident." *Id*. He stated that "[t]he results to the examination appear to be consistent with psychiatric and cognitive problems, although without more information about the claimant's cognitive functioning, it is difficult to determine whether she has the ability to function on a daily basis." Tr. 288-89. Dr. Dufy diagnosed "unspecified depressive disorder" and "mild neurocognitive disorder, rule out." Tr. 289.

On April 9, 2015, Plaintiff presented for a consultative internal medicine examination by Michael Rosenberg, M.D. ("Dr. Rosenberg"). Tr. 291. Plaintiff identified migraine headaches, depression, and pain in her left hip, lower back, and left knee as her chief complaints. Tr. 291. She reported that her migraine headaches occur daily; they are located in the frontal occipital region of

9

her head; and they are often triggered by aroma, light, and sometimes sound. *Id*. She rated her headache pain as 9 out of 10. *Id*. Plaintiff reported that she was diagnosed with depression in 1993 and has attempted suicide on three occasions; she also reported she still "occasionally" had suicidal thoughts but no intent or plan. *Id*.

Plaintiff reported "sharp" pain in her hip, back, and knee rated as 8 out of 10, and it was worsened by sitting, standing, sleeping, and prolonged walking. Tr. 291. She stated that the pain began after her motor vehicle accident but had worsened over time. *Id*. Upon examination, Dr. Rosenberg noted pain upon palpation of the lumbosacral spine; pain with range of motion of the lumbar spine; and limited ability to squat secondary to left knee pain. Tr. 293. He assessed Plaintiff with "mild to moderate restrictions for activities that involve prolonged squatting and kneeling" and also found that Plaintiff "has restrictions for any activities that entail exposure to bright lights and loud sounds." Tr. 294.

On May 26, 2016, Plaintiff's treating provider at DENT ordered an MRI of her brain because her migraines were progressing in intensity, frequency, and symptoms despite pharmacologic intervention. Tr. 411.

On November 23, 2016, Plaintiff presented to University Neurology Inc. ("University Neurology") for evaluation of her chronic headaches. Tr. 455. She was still experiencing daily headaches despite the Botox treatments; however, the Botox treatments were successful in decreasing the intensity of the headaches. Tr. 455. Plaintiff was advised to cease taking Cambia 50 MG oral packet and began taking Diclofenac Potassium 50 MG oral, as needed for severe headaches. Tr. 458. Plaintiff was also administered a Botox injection as treatment for her headache pain. *Id*. On February 27, 2017, Plaintiff again presented to University Neurology, complaining that her headaches had been "unbearable" since her last visit. Tr. 460.

Plaintiff argues that it was error for the ALJ to find her capable of performing "detailed, but not complex work," in light of Dr. Duffy's opinion that Plaintiff could "only follow and understand simple directions and instructions." *See* ECF No. 9-1 at 16 (citing Tr. 288). Accordingly, argues Plaintiff, the ALJ used her own lay opinion to determine that Plaintiff could perform detailed, and not complex work. *See id*. at 15-19. Contrary to Plaintiff's assertions, Dr. Duffy's opinion is not inconsistent with the ALJ's finding that Plaintiff could perform detailed but not complex work, without any fast assembly quota pace, and with only having occasional interactions with coworkers, supervisors and the public. Tr. 16.

A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*,

11

508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, it is the claimant's burden, not the Commissioner's, to demonstrate the functional limitations she claims. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating by reference 42 U.S.C. § 423(d)(5)(A)); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) (it is Plaintiff's burden to establish that she is disabled); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (finding an ALJ can deny benefits based on a lack of evidence on a matter for which the claimant bears the burden of proof); *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (citations omitted) ("The claimant bears the ultimate burden of proving [disability] throughout the period for which benefits are sought."); *Parker v. Berryhill*, No. 17-CV-252-FPG, 2018 WL 4111191, at *4 (W.D.N.Y. Aug. 29, 2018) (holding that a plaintiff bears the burden of showing her RFC is more limited than that found by the ALJ) (citations omitted).

In light of this burden, Plaintiff is specifically required to demonstrate the existence of a severe impairment or impairments that resulted in an RFC preventing her from performing substantial gainful activity during the relevant period. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. § 404.1512. Plaintiff has not met that burden here. Additionally,

Plaintiff misstates Dr. Duffy's finding, arguing that Dr. Duffy "found that Plaintiff could *only* follow and understand simple directions and instructions." *See* ECF No. 9-1 at 16 (emphasis added). This statement is just plain misleading, and the Court finds no acceptable excuse for such an argument. Rather, Dr. Duffy opined that Plaintiff could "follow and understand simple directions and instructions," not that she could *only* follow and understand simple directions and instructions. Tr. 288. Indeed, Dr. Duffy did not preclude complex tasks; instead, he found only that Plaintiff "may have mild to moderate difficulties performing complex tasks independently." Tr. 288. Furthermore, Dr. Duffy's assessment is not inconsistent with the ALJ's RFC finding. Tr. 16, 23.

The evidence in the record, including Plaintiff's own reports regarding her functionality, demonstrate that Plaintiff was capable of performing detailed but not complex tasks. For example, in a function report completed by Plaintiff on February 26, 2015, Plaintiff reported that she did not have trouble paying attention, finishing what she started, following spoken and written instructions, or getting along with bosses, teachers, police, landlords, or other people in authority positions. Tr. 221. Additionally, Plaintiff stated she did not need any special help or reminders to take care of her personal needs or grooming. Tr. 216. She also stated that when she went out, she walked, drove or rode in a car, and she could go out alone. Tr. 217. She shopped for groceries in stores for 20-30 minutes every other week, and she paid her bills. Tr. 218. On April 9, 2015, Plaintiff told Dr. Rosenberg that she could cook four to seven times a week, wash laundry twice a week and shop once a week. Tr. 292. Plaintiff also reported that she could shower and dress herself, as well as watch television and listen to the radio. Tr. 292. Plaintiff also reported to Dr. Duffy in April 2015 that she could dress, bathe, and groom herself, cook, clean, wash laundry, and shop. Tr. 288.

The ALJ also considered the opinion of the state agency psychologist Dr. Marks, who reviewed the record in May 2015 and opined, *inter alia*, that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, and that she was moderately limited in her ability to carry out detailed instructions. Tr. 92. Dr. Marks also opined that Plaintiff was moderately limited in her ability to sustain a routine; that she was not significantly limited in her ability to interact appropriately with the general public, or in her ability to work in coordination with or in proximity to others without being distracted by them; and that she was not significantly limited in her ability to make simple work-related decisions (Tr. 92-93). These findings are all consistent with the ALJ's RFC finding, and the ALJ properly assigned the opinion great weight. Tr. 16, 23.

As the ALJ noted, state agency consultants, such as Dr. Marks, are highly qualified and experts in Social Security disability evaluation. Tr. 23-24. Accordingly, the regulations specifically direct the ALJ to consider their opinions, applying the factors set forth in 20 C.F.R. § 404.1527(c). 20 C.F.R. §§ 404.1513a(b)(1), 404.1527(e). Likewise, the Commissioner's regulations permit the opinions of non-examining sources, such as state agency consultants, to constitute substantial evidence in support of the ALJ's decision, and even to override treating source opinions when they are well supported. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016). Here, the opinion of Dr. Marks supports the ALJ's finding that Plaintiff could perform detailed, but not complex, work, without a fast assembly quota and with only occasional interaction with coworkers, supervisors, and the public. Tr. 23.

The ALJ also properly assigned great weight to Dr. Duffy's opinion because it was based on a detailed in-person examination from a specialist with knowledge specific to Social Security rules and regulations. Tr. 23. Dr. Duffy opined that Plaintiff could follow and understand simple

14

directions and instructions, that she could perform simple tasks independently, and that she may have some mild to moderate difficulties maintaining attention and concentration. Tr. 288. He further opined that Plaintiff could maintain a regular schedule, and that she may have mild to moderate difficulties learning new tasks and performing complex tasks independently. Tr. 288. Dr. Duffy also opined that although she may have some moderate difficulties dealing appropriately with stress, Plaintiff could make appropriate decisions and could adequately relate with others. Tr. 288. Dr. Duffy's limitations are consistent with and supported by his mental status examination findings. Dr. Duffy found that Plaintiff was cooperative, had adequate social skills, appropriate dress, good hygiene and grooming, appropriate eye contact, normal speech and normal language. Tr. 287-88. Plaintiff also had normal thought processes, appropriate fund of information, and intact orientation and sensorium. Tr. 287-88.

Plaintiff argues that the ALJ erred in her analysis of Dr. Duffy's opinion because despite affording "great weight" to the opinion of Dr. Duffy, the ALJ failed to incorporate all of his findings into her analysis of Plaintiff's RFC. *See* ECF No. 9-1 at 16. However, as noted above, the ALJ was not required to adopt all of Dr. Duffy's findings, especially, where, as here, the treatment records suggested that Plaintiff was not as limited as she suggests. *See Matta v. Astrue*, 508 F. App'x 53, 56 ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). In so doing, the ALJ may "choose between properly submitted medical opinions." *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is

free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588.

Here, there was sufficient evidence from which the ALJ could assess Plaintiff's RFC during the relevant period, including the opinions from Dr. Marks and Dr. Duffy discussed above. The ALJ also discussed other evidence of record that demonstrated largely benign examination findings, including a "pleasant attitude," normal orientation, intact memory, appropriate attention span and concentration, appropriate fund of knowledge, and normal speech. Tr. 15, 322, 330, 409, 452, 458. Moreover, as the ALJ discussed, the records usually show grossly normal examination findings, including stable mood, pleasant attitude, normal speech, appropriate affect, normal memory, normal attention, normal language, and normal fund of knowledge. Tr. 15, 318-422, 444-79, 347. The ALJ also noted that in December 2016, Plaintiff stated that she had not been under psychiatric care since 2012. Tr. 1311. Plaintiff, who bears the proof with regard to her RFC, simply has not provided evidence demonstrating that greater limitations are warranted, beyond those already found by the ALJ. *See Poupore*, 566 F.3d at 306; 20 C.F.R. § 404.1512.

Plaintiff also takes issue with the ALJ's consideration of Plaintiff's alleged neurocognitive impairments. *See* ECF No. 9-1 at 17. However, the ALJ properly found that there was no evidence of a neurocognitive disorder or diagnosis in the record and noted that Dr. Duffy did not assess a neurocognitive disorder. Tr. 13. As the ALJ noted, there is no indication in the records, or from Plaintiff, that this alleged impairment caused any symptoms or limitations beyond those caused by her migraine headaches and psychiatric conditions. Tr. 13. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (The Commissioner "is entitled to rely not only on what the record says, but also on what it does not say[.]" (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981))). Furthermore, the ALJ correctly determined that Plaintiff's mental impairments, both singly and in

16

combination, did not meet or medically equal a listed impairment. The ALJ also noted that even if there was a medically determinable neurocognitive disorder at step two, Plaintiff has not shown any additional limitations stemming from such an impairment. Tr. 13.

Moreover, Dr. Dufy merely indicated a "9 out" diagnosis of mild neurocognitive disorder. Tr. 13, 289. "In medicine, the phrase 'rule out' means to eliminate or exclude something from consideration. It does not constitute a diagnosis." *Timmons v. Berryhill*, No. 6:16-CV-06314 (MAT), 2017 WL 2821558, at *3 (W.D.N.Y. June 30, 2017) (quoting *Merancy v. Astrue*, 2012 WL 3727262, at *7 (D. Conn. May 3, 2012) (collecting cases)); *see also Jackson v. Berryhill*, 2017 WL 2399459, at *2 (2d Cir. June 2, 2017) (rule out diagnoses are "possible diagnoses that [have] not been ruled out, pending further evaluation"). Thus, the ALJ properly determined that Dr. Duffy's assessment of "mild neurocognitive disorder, rule out" was not an affirmative diagnosis of neurocognitive disorder, and she was not required to treat it as such.

Contrary to Plaintiff's arguments, the ALJ discussed Dr. Duffy's opinion that Plaintiff's memory was mildly impaired, and that she had somewhat below average cognitive functioning, which supported mild limitation in understanding, remembering, or applying information. She also noted that Plaintiff's treatment records otherwise consistently showed normal memory with no evidence of cognitive deficits. Tr. 15, 444-79. Based on the foregoing, the ALJ did not substitute her own lay opinion in reaching Plaintiff's RFC finding, but rather, relied on opinions from Dr. Duffy, Dr. Marks, and treatment notes, as well as Plaintiff's own statements about her functioning during the relevant period. Accordingly, the ALJ's RFC finding was supported by substantial evidence, and the Court finds no error.

Plaintiff also argues that the ALJ should have further developed the record by ordering cognitive testing based on Dr. Duffy's opinion. *See* ECF No. 9-1 at 20 (citing Tr. 289). However,

an ALJ's duty to develop the record is not limitless. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x at 34. Most basically, an ALJ need not further develop the record "when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" *See Janes v. Berryhill*, 710 F.App'x 33, 34 (2d Cir. Jan. 30, 2018) (summary order (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. Jan. 8, 2015) (summary order) (although an ALJ has a duty to develop the record, where there are no obvious gaps and the ALJ possesses a complete medical history, he is under no obligation to seek a treating-source opinion (citations omitted)).

In summary, the record before the ALJ sufficiently documented Plaintiff's mental impairments and treatment, and the ALJ was not obligated to order cognitive testing simply based on Dr. Duffy's "rule out" mild neurocognitive disorder. As detailed above, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). Furthermore, as discussed above and in the ALJ's decision, the record generally showed largely normal examination findings during the relevant period. Tr. 15, 318-422, 444-79. As also discussed above, Dr. Duffy did not affirmatively diagnosis a neurocognitive disorder opinion, and his opinion is not inconsistent with the ALJ's RFC finding. Moreover, as the ALJ properly determined, even if Plaintiff has a medically determinable neurocognitive disorder, any such limitations were considered in the RFC assessment. Tr. 15.

Plaintiff's burden was to show no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's

findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). Although Plaintiff may disagree with the ALJ's characterization of the evidence, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d at 588. Here, the Court finds that the ALJ properly developed the record with respect to Plaintiff's alleged neurocognitive disorder. Accordingly, Plaintiff's argument fails, and the Court finds no error.

For all the reasons discussed above, the Court finds that the ALJ properly considered the record as a whole, and her findings are supported by substantial evidence substantial evidence in the record as a whole. Therefore, the Court finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 16) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE